Thank you for being here virtually today. You're in front of the First District Appellate Court, the Second Division, and today your panel is myself, Terry Lavin, and my colleagues, Justice Cynthia Cobbs and Justice Aurelia Puchinski. We're here for the case of the people of the state of Illinois versus Jarman, I don't know if I'm pronouncing that correctly, Edwards, case number 1-18-2245. Will counsel please identify yourself and tell us who you represent? I'm Anna Carlozzi, I represent Mr. Edwards. Okay. I'm Assistant State's Attorney Tasha Marie Kelly on behalf of the people. Okay, the way our particular division is handling this issue is to give each side 10 minutes time uninterrupted by any questions from us in order to present the main of your arguments. After that we'll start to hit you with a few questions here or there, maybe three to five minutes worth of questions, and the same will apply to both parties and then the appellate defender will have let's say five minutes for rebuttal. So with that in mind, why don't we proceed? Thank you. Good morning, your honors. Again, for the record, Anna Carlozzi from the Office of the State Appellate Defender, representing Mr. Jarman Edwards. We're here today on a denial of a motion to suppress evidence. The court erred in making that decision because it's clear that Mr. Edwards was seized when the their emergency lights. When the officers first encountered Mr. Edwards, Mr. Edwards was parked, excuse me, he was stopped parallel to the street. The officers pulled up parallel to him, spoke to him very briefly, and then they backed their car up so that their car was facing Mr. Edwards' car face on. At that point, they then pulled forward and slightly to the right so that their car was parked at an angle, effectively blocking Mr. Edwards from pulling his car straight out. They also activated their emergency lights. By blocking Mr. Edwards in and activating their emergency lights, they were communicating to him that he was not free to leave. The officers, in fact, testified that Mr. Edwards was not free to leave at this point, and their actions, again, were a clear communication to him that he could not leave the area. To believe that Mr. Edwards was free to leave is to believe that a reasonable person would think it was appropriate after a police car blocked them in and activated their emergency lights to back up the car and maneuver around the police and leave the scene. And no reasonable person would believe that they were free to do that in that situation. Now, normally we give deference to the trial court's factual findings, but here the court did not address the effect of the squad car's positioning and lights on Mr. Edwards. And so in this case, there's just not many relevant findings to give deference to. Given the inconsistencies between the officers' various versions of events, the video evidence here is important, and the video allows your honors to see exactly what the court saw below. And what the video shows is that there was no basis for a seizure in this case. Both officers testified that they believed Mr. Edwards was violating some traffic ordinances. Officer Ali testified that Mr. Edwards was violating an ordinance that prohibited a car parked on the side of a lighted street from having its lights on. There is no ordinance that prohibits a car parked on the street from having its lights on. And furthermore, Mr. Edwards was not parked because he was in his car. Officer Farias on the other hand testified that Mr. Edwards was obstructing traffic, but when the police encountered Mr. Edwards, there was no traffic to obstruct. Now, the officers were in the area to begin with because they had received a shot spotter alert. But other than that bare fact, there's not much to go on There was only one alert. There was no corroborating 911 calls, reporting any gunshots heard in the area. There was no one in the area indicating that a gun had been fired. There's no one running away or anything like that. There's simply Mr. Edwards stopped in his car. Furthermore, both officers testified that when they encountered Mr. Edwards, they did not suspect him of firing the shot that was detected. They simply were treating him as a potential witness. Finally, the officers testified to some up and down arm movements that Mr. Edwards made. It's unclear from the record when exactly they saw these movements. They testified to various points. But even if these arm movements happened before the officers backed up their car and activated their emergency lights, these arm movements were innocuous. There are plenty of reasons why someone might reach down to the floorboard of their car. And in this case, when the officers asked Mr. Edwards what he'd been reaching for, he explained that he had been reaching for his phone, which had fallen. And so these movements, again, were not enough to justify his seizure. So in summary, Mr. Edwards was seized when the officers locked his car in and activated their emergency lights. And they did not have a reasonable, they did not have an articulable suspicion of criminal activity. So we ask that you reverse the trial court's denial of the motion to suppress and reverse his conviction outright, because without the gun, the state would be unable to prosecute him on retrial. Okay, I have a couple questions for you. First of all, let's just talk about some factual issues. I believe that reading the record and looking at all the evidence in the case that two vehicles, the police vehicle and the defendant's vehicle were going in opposite directions on the street, right? Correct. And so that when they pulled up to the side of the defendant's vehicle, it's driver to driver, but they're on opposite sides of the road, right? Yes. And then at some point after that is when the police officer decided to move his vehicle and block the defendant's vehicle, right? Correct. And you're saying that there wasn't enough to justify what's called a Terry stop, right? Correct. Why isn't the fact that there was a shot spotter alert, plus the fact that the one other fact I need to get to the defendant's car, there was testimony that the defendant's car was stopped in the street, but it was in the middle of the street. It wasn't on the curbside, right? It was. Both officers testified that it was off the curb. I would not characterize it as in the middle of the street, but it was a couple feet off the curb. Yeah, it wasn't like he was he was parked there curbside just involved some conversation or something. It was parked more in the main lane of traffic, correct? Yes. All right. So what about the legal issue? Why isn't the shot spotter alert plus the car obstructing traffic enough to justify a Terry stop in your judgment? So there was no traffic for Mr. Edwards to obstruct at that time. And again, the shot spotter alert, there was just nothing to corroborate that. The officers did not know when exactly the shot was detected. The way at least that Officer Ali explained how shot spotter works is that there's a device that detects a potential gunshot. It gets sent to some place in California, someone there reviews it determines if it's an actual gunshot and then it's sent back to the Chicago Police Department who then send out an the officers did not know when the shot was fired. And this court recently decided a case where they basically determined that a person just being in the area of recent gunshots doesn't give officers free reign to investigate any person in the area. And was the alert in the general area of where the defendant's car was parked in the street? Yes. It was on Carpenter Street, if I recall correctly. Yes, it was. It was very near to where Mr. Edwards, his car was stopped. Okay, that's all the questions I have. Colleagues, anything? Carpenter Street is just a normal residential street. It's like a two lane street probably with room for cars to park on both sides. It's not a four lane highway. Correct. Yes, Mr. Edwards was sitting on the residential street. Yeah, just a residential street. So three feet off the curb would in fact be in the middle of the lane for cars to drive down. So while he might have been extending into the lane where other cars would have had to drive. Again, there were no other cars at the time the police saw him. Is that what you're making is a trees and forest sort of argument? Just because there were no cars to be obstructed, it doesn't count as obstruction? Is that what you're telling us? Well, so the statute says that an operator of a vehicle shall not so operate the vehicle as to form an unreasonable obstruction to traffic. So to me, it seems like you need traffic to actually obstruct to violate that ordinance. Even if in this case, maybe the presence or absence of traffic doesn't matter. In this case, it still has to be an unreasonable obstruction. And so if cars are still able to maneuver around Mr. Edwards, that's not an unreasonable obstruction. Um, in this case, when the police a case that says that I cited to a case, in I believe my opening brief, it's the facts are not the same. But it was a car that was driving very slowly, maybe not very slowly, but it was driving slowly down the street. And the police stopped the defendant in that case, because she was obstructing traffic. And the court later reversed finding that because cars have the option to go around that car, she was not unreasonably obstructing traffic. So not the same exact facts. But again, in this case, cars could have and in fact, were able to maneuver around, not just Mr. Edwards, who was parked a couple feet off the curb, but the officers who were in the middle of the street, and their squad car that had its front end extending far past where Mr. Edwards car was. And him. His car being in the middle of the street is not reason enough for them just to stop him and ask him more questions. According to you? Yes, because he was not unreasonably obstructing. No traffic. There was not a reasonable suspicion to stop him. Okay, that's that's that's where you lose me. You say there is not obstructing known traffic. Show me where in the statute or any cases it's known traffic that there has to be vehicles in the exact proximity of where the defendant's car is. Oh, yeah. Yeah, sorry. I, um, I did not say known. I said he was obstructing. I said no I guess traffic that was there. I think your point remains. And again, the ordinance is very short, but it just says that someone should not operate their vehicle to unreasonably obstruct traffic. Okay. Is there any testimony that there was did one of the officers testified that a car did pass by while this was occurring? Yes. Was there a car that did pass by? They couldn't go directly. They did have to veer off in order to get past. Is that correct? Yes, that was well after the officers had seized Mr. Edwards. And the reason why that car had to go so far around was because both officers were in were standing in the middle of the street. And because of the way they had parked their car past Mr. Edwards car. So, um, but the officers and I'm sorry. But if defendant's car had been properly parked closer to the curb, the officer's car might not have been where it was. I mean, there are a whole lot of ifs based on where defendant's car was, but I want to ask you a question. Um, well, I think we've covered, you know, the, the, the, the, the shots alert and the individual, the defendant's car and the location. You said something about it's reasonable for anyone to reach to their floorboard. The explanation given was that he was reaching for the phone, but wasn't the phone on the console. Um, yes. Uh, so first, what's important here is the various times that the officers claimed that they saw Mr. Edwards, um, reach down to the floor. Um, the officer various testified that it was as soon as he was pulled up parallel to him. And then he backed up, um, officer Ali testified it was when they were next to him as they were backing up, um, as they were approaching and as, or as they were talking to him. Um, his testimony was not consistent with, uh, when exactly they saw Mr. Edwards conduct the up and down movement. Um, but at the point where the officers were in a position to see, um, the phone on Mr. Edwards, uh, middle console, um, those movements had already happened. And so it's just possible that Mr. Edwards was successful in picking up his phone when he reached out to get it. Okay. From your colleague now for the state. Again, uh, I'm assistant state attorney Tasha Marie Kelly on behalf of the people, the trial court's decision to deny the defendant's motion to suppress should be affirmed here because the officers in this case possessed three key pieces of knowledge at the time that they pulled their car in front of a defendant's vehicle. Um, that's when defendant is claiming that the seizure in this case happened. Um, there were the three factors that the officers possessed, the three pieces of knowledge, the officers possessed at that time were defendant was parked three to six feet off the curb with his lights on at nine 30 at night. Okay. They were responding to a shot spotter notification. They observed the defendant making suspicious gestures with his right arm towards the floorboard. So I'll address the significance of those three factors individually. First, the shot spotter notification. These were called to the specific address of 56 48 South Carpenter. In response to a notification that several rounds had been fired, received the notification and arrived at that address. Three minutes later, they found defendant the only car in the area. He is parked as the trial court described it suspiciously off the curb. Um, ask the defendant. Did you hear shots? Do you know anything about a shooting? He responds that he didn't hear anything. Shot spotter notification is significant, um, because in the cases that the people cited both in their brief and in their motion to Pennsylvania case, the court discussed the significance of a shot spotter alert as opposed to officers responding to a call of general criminality. And what the courts said about a shot spotter alert in an emergency report is that it can support an officer's reasonable suspicion with less objective evidence to corroborate a report because the inherent danger of gun violence set shootings apart from other criminal activity. Explain that the rule that requires less substantial before making a stop based on an emergency report enables an officer to obtain information for his own safety and that of the other officers. And it talked about how, while the circumstances in Rickman, um, such as the was found in the area of the shot spotter notification and that he was acting evasively might not be sufficient on its own when it's considered collectively, um, it creates a reasonable suspicion. And so with that in mind, in this case, we have the shot spotter notification and the other two factors that I discussed, which is the defendant being parked off of the curb and with his lights on. And while defendant argues that he wasn't actually obstructing traffic at the time or that he doesn't meet the definition of parked, what's significant in looking at it is at the time that the officers saw defendant parked there off the curb, they reasonably believed that he was in and beyond that fact, if if you look at the video, you see that there is actually a car that drives by during the course of this traffic stop, which has to veer out of its own lane into the opposite lane in order to get around the defendant and the police vehicle. And while defendant argues that the car is actually maneuvering around the police officer, the reason that the police officer is standing so far into the street is because the defendant is so far off the street and the police officers at the defendant's car window. So the third factor that the officers have at the time that they move their car and, um, block in the defendant's car is the observation of these suspicious gestures by defendant. And again, while defendant sites, uh, some cases in his brief that say that heard of gestures in and of themselves are not enough to create a reasonable suspicion, what Rickman and Raglan, the Pennsylvania case, tell us is that when you look at all of these factors in combination, it can create a reasonable suspicion. So here, uh, the people's position is that the combination of these three factors created a reasonable suspicion at the time that the officers did the Terry stop in this case. And furthermore, during the course of the Terry stop, they made the observations that we have discussed in our brief, such as the fact that the defendant was acting nervously during the course of the stop, the fact that they saw that he was in possession of an F. O. I. D. Card. The fact that they saw him continuing to make suspicious gestures this time with his leg and the fact that they observed an empty holster on the floor of his car that he provided no reasonable explanation for that as the officers continue to make these observations during the course of their investigatory stop, they developed a reasonable objective suspicion that this defendant was armed, which justified their decision to ask the defendant to step out of the car. So for these reasons, and for those further explained in our briefing, I'll start with a few questions. Is it the position of the state that it would be enough to justify a Terry stop just on the basis of the, uh, shots fired alert, plus the fact that the defendant is stopped in the middle of the street, uh, out there in Carpenter? That would be enough. Combined with the suspicious gestures that they I'll get to the suspicious gestures, but I want to talk about just specifically the fact that they get this alert. It's on Carpenter Street. They go over to Carpenter Street, which, by the way, I grew up on May Street two blocks away, so I'm familiar with the area. Um, uh, they go out there and they see the car there in the middle of the street. Are those two factors by themselves not to the arm movements enough in your judgment to justify a Terry stop? Well, I would say that a combination of those two factors, and I apologize if there's construction going on across the street and it's really loud. So if you can hear that, I'm going to call it Terry stop on you. I don't think they named this after me, but not a problem. Um, I would say that combination of those two factors, along with the fact that, um, the defendant is the only person in the area, um, that there's no one else there, that they arrived there three minutes after the shot spotter notification, that the combination of those factors would be enough. And I'm sorry, I'm not yelling at you if I'm really loud. I am. I'm trying to hear myself over the construction. We've been scolded before. Um, so let's now go to the arm movement. Specifically, factually, are you telling us that it's the state's position in terms of the evidence presented at trial that the suspicious arm movements that they observed him reaching toward the floorboard occurred before they moved their police squad car in a way, in an effort to block defendant's car? There is some discrepancy in the, in the record here. The one officer clearly testifies, I believe it's officer various that he observes the arm gestures twice before they move the car. The other officer, uh, officer Ali, when he's questioned by the court specifically during the motion, he seems to suggest that the, he observed the arm movements as they were in the process of moving the car. So there, there is a slight discrepancy. The, uh, the one officer, um, testifies that he saw the gestures twice before they moved the car. Okay. That's all I have. Thank you. Nothing. Okay. Is there anything in the record that tell us exactly what prompted the officers to move the car? Uh, the officer, both officers testified that they decided to conduct a traffic stop. Uh, and so they moved the car. I'm, I'm not quite sure if they moved it because they felt like they were going to be there for a while because they were conducting the traffic stop. They don't specifically say that that's the inference that I got from it. Um, but no, there's no specific explanation. Well, ordinarily just the traffic stop, you would just leave the car there where it is. Um, you anticipate it's not going to be for a very long duration, but I just wondered if there was something that prompted the movement of the moving of the car to block. It wasn't early. That's not what happens in just a routine traffic stop or an inquiry about shots fired. This would be pure speculation on my part, but my guess was that because the defendant's car was parked so far off the curb for them to leave their car where they were, they, they, you know, the two of them were really blocking the lane completely. So that might've also, well, I don't know if I buy that because if they were trying to not obstruct, they would just move their car further as opposed to blocking it. Uh, yeah, I don't know that by that. Yeah. I mean, like I said, there's no clear explanation of the record. Thank you. Okay. Let's hear a rebuttal from the public and the appellate defender. Um, first I'd like to talk about, um, some of the shot spotter cases that the state discussed. Um, I think the biggest difference between those cases in this case is that in both of those cases, um, the officers testified that they suspected the defendants of in fact, firing those shots that were detected in this case, neither officer believed that Mr. Edwards fired the shots and they were treating him as a witness. Um, and so in Ragland, um, when the officer arrived to the scene, um, he saw the defendant and another man, uh, suspected them of, uh, shooting the gun that, um, had the shot that had been detected, um, began following them. And then as soon as they exited their, um, as soon as they got to their location, their destination and exited their car, he, um, you know, had them place their hands on them. Um, and again, in Rickman, um, that involved a case where the officer, um, showed up to a location where there had been two shot spotter alerts. Uh, the first one was of, uh, I believe two gunshots. And then the second alert had been three gunshots. There had also been 911 calls reporting the gunshots. And when he left, uh, or excuse me, when he arrived to the scene, there was a car that was leaving. And so he stopped the car, um, suspecting that potentially these people, um, had been involved. Um, and there had, there was also, I think a little farther down a crowd of people. Um, and so in this case, uh, the officers do not suspect Mr. Edwards of firing the gun. Um, he was not leaving the area. He was simply standing in his car. Um, and so that's kind of the difference here. Um, they did not suspect him of firing the shot that was detected. And so that's, that shouldn't really have any relevance, um, because if they didn't suspect him of firing the shot, then that shouldn't have, um, added to their reasonable suspicion, um, of criminal activity. Um, um, and the state also said that, um, you that Mr. Edwards had been in violation of, um, some traffic violations, but again, there was, uh, no traffic that Mr. Edwards was, um, obstructing, um, and his, even if he was a little too far out into the road, the officers easily could have just asked him to pull closer to the side of the street. Um, this is not something that, uh, because there was no actual obstruction happening, uh, it did not give them a reasonable suspicion of criminal activity. Um, and so Mr. Edwards requests that this court, uh, reverse the trial court's ruling and reverse his conviction outright. Okay. Uh, thank you both for your excellent briefs and arguments. Uh, we will take the matter under advisement and come back with a opinion for you in short order. We are adjourned.